**INDUSTRIA E. COMERCIO DE MIN-ERIOS, S. A. and United States of America, Appellants,**

v.

**NOVA GENUESIS SOCIETA PER AZI-ONI PER L'INDUSTRIA ET IL COM-MERCIO MARITIMO, Appellee.**

No. 8610.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 28, 1962.

Decided Nov. 9, 1962.

George B. Warburton, New York City (Michael B. Wagenheim, Norfolk, Va., and Hill, Rivkins, Louis & Warburton, New York City, on brief), for libellant-appellant.

C. V. Spratley, Jr., U. S. Atty., on brief, for appellant United States of America.

William A. Grimes, Baltimore, Md. (Leon T. Seawell, Norfolk, Va., Ober, Williams, Grimes & Stinson, Baltimore, Md., and Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

The appeal in this case is taken by the libellant, Industria E. Comercio de Minerios, S. A., a Brazilian corporation, hereinafter called ICOMI, from a decree of the District Court wherein the court granted the motion of Nova Genuesis Societa Per Azioni Per L'Industria Et Il Commercio Maritimo, the respondent, an Italian corporation, to decline jurisdiction under the doctrine forum non conveniens because all the parties interested in the subject of the suit are foreign corporations. The libellant also appealed from a portion of the decree which denied a motion of the United States to intervene as a party libellant. This raises the most important question before the court since jurisdiction would not have been denied by the District Judge, as his opinion indicates, if the United States were a proper party.[1]

The controversy grows out of the loss at sea on February 2, 1958 of the steamship Bonitas, an Italian vessel, which was owned by the Italian corporation which is the respondent in this case. She was carrying a cargo of manganese ore from Santana, Brazil, to Baltimore, Maryland, which had been shipped by ICOMI in fulfillment of a contract of June 7, 1953 between ICOMI and the United States, wherein ICOMI agreed to obtain large quantities of the ore and to ship it in vessels from Brazil to such ports as the United States might designate. The agreement provided that ICOMI was to have the cargo insured and the policy of insurance which covered the lost cargo in this case was issued by the Eagle Star Insurance Company, a British corporation, and purported to cover ICOMI and such other persons as their interests might appear.

The libel was originally filed in personam by two New York corporations which had arranged for the shipment and the insurance as the agents of ICOMI. It was brought against the respondent owner of the Italian ship on the ground that the vessel was unseaworthy and hence her owner was liable to the libellant in the sum of $650,000 for the damages sustained in the loss of the cargo. A few days after the libel was filed it was amended by order of court to substitute ICOMI in place of the original libellants since it was shown that they served only as agents for ICOMI in bringing the suit. Service of process was made upon certain persons alleged to be officers of the owner of the ship who were temporarily in Norfolk, Va., attending funeral services for members of the crew of the ship. A motion to quash the service of process was filed on the ground, amongst other things, that the respondent was not engaged in any business within the jurisdiction of the court. The District Judge did not find it necessary to pass on this question.

After the ship was lost the United States first took the position that it had no interest in the cargo or in the insurance since the cargo had not been delivered. Thereupon, ICOMI's agents collected the insurance in the sum of $593,019.28 from the British insurance company and, with the consent of the United States, paid $144,582.62 out of the moneys received to the Export-Import Bank pursuant to a contract between the bank and ICOMI. Subsequently, the United States discovered that under the terms of its contract with ICOMI delivery of the cargo was made to it at the time that it was loaded on board the ship at Santana and, therefore, it had title to the cargo and was entitled to the insurance money. This claim was recognized by ICOMI and the money which it had received from the insurance company, less the sum of $144,582.62, was paid by it to the United States.

By reason of these circumstances the complexion of the case has changed. It is no longer a suit by the owner of the cargo against the owner of the ship for losses incurred by the failure to furnish a seaworthy vessel. United States claims the right to come into the case as the

1. The opinions of the District Judge are found in 172 F.Supp. 569, and 197 F.Supp. 699.

representative of the insurance company in order to recover on its behalf the value of the cargo lost through the shipowner's default. The insurance policy contained provisions which entitled the insurer to any recovery that might be had from the shipowner if it should be shown that the loss was attributable to its negligence; and ICOMI in support of the motion of the United States to intervene, therefore, contends that under the specific terms of the policy the United States is bound to prosecute the claim against the shipowner in order to enforce the insurance company's rights and must be let into the case for this purpose. The policy of insurance issued by the British company to ICOMI's agent to cover the shipment contains the following passage on which ICOMI bases its contention:

> "It is also agreed that * * * this Company in these and all cases of loss or damage by perils insured against shall be liable and owe actual payment for (only) what cannot (and could not in the absence of this insurance) be collected from carriers and/or bailees of property lost or damaged, and/or their insurers, and also shall be chargeable with the direct pecuniary loss to the assured temporarily arising from delay in collection from said carriers * * * and the advancing (for the purpose only of avoiding such pecuniary loss) of funds to the assured for his protection pending such delay shall in no case be considered as affecting the question of the final liability of this Company, and as soon as collection is made from carriers * * * the assured shall retain only such proportion of the sum or sums so advanced by this Company as will, with the amount collected from carriers and/or bailees * * * make up the sum of the assureds loss, and the balance of such sum or sums as may have been advanced by this Company shall thereupon be paid back, to this Company * * *."

This language is not a model of lucidity but the meaning becomes more clear from the meaning put upon it by the parties to the contract in a loan receipt signed by ICOMI's agent upon the receipt by it of the payment by the insurance company. This document recited that ICOMI had borrowed and received from Eagle Star Insurance Company the sum of $598,019.28 as a loan repayable out of any recovery ICOMI might make from anyone by reason of any claim for loss of the property described in the policy and as security for such repayment ICOMI delivered to the insurance company the bill of lading and other documents of title to the property.

Then comes the following language which sets out the obligations which the insured assumed upon receiving payment of the loss:

> "In Further Consideration of the said advance, the undersigned hereby guarantees that it is entitled to enforce all rights under the documents aforesaid covering said property; and hereby appoints the officers or designee of the said Eagle Star Insurance Company, Ltd., their successors, severally, its agents and attorneys-in-fact, with irrevocable power to collect any such claim or claims and to enter and prosecute in its name, compromise or withdraw any and all legal proceedings which they may deem necessary to enforce such claim or claims against any person or persons, corporation or corporations, government or governments; and to execute in its name any documents which may be necessary to carry into effect the purposes of this agreement; and to indorse and collect any check, bill of exchange, or other instrument received in settlement or compromise of any claim or legal proceeding. The undersigned further agrees all such proceedings shall be under the exclusive direction and control of the said insurance company or their attorneys or designee. It is agreed that the said insurance company

shall indemnify the undersigned against any expense in connection with any such claims or proceedings; that all such expense shall be deducted in the first instance from the recovery, if any, and that any expense in excess of the recovery shall be paid by the said insurance company."

Thus, it appears, putting the United States as the beneficiary of the insurance in the place of the named insured, that the United States has assigned its interest in the claim against the owners of the ship to the insurance company and that the United States has authorized the insurance company to bring suit in its name against the carrier to recover the loss. The United States has not agreed to bring suit itself. In this respect the contract differs from that approved and given effect by the Supreme Court in Luckenbach v. W. J. McCahan Sugar Co., 248 U.S. 139, 147, 39 S.Ct. 53, 63 L.Ed. 170, where the insured, upon receiving payment for the loss from the insurance company, agreed to enter and prosecute suit against the carrier under the direction of the insurance company. In the instant suit it is not alleged in the petition of the United States to intervene or elsewhere that the United States has been requested by the British insurance company to press the suit but it is obvious that the United States is acting only on Eagle's behalf since the United States has been fully paid and has no interest in the controversy. In short, the suit has become an action by ICOMI, the seller of the goods, a Brazilian corporation, against the respondent owner of the ship, an Italian corporation, for the benefit of the Eagle Star Insurance Company, a British corporation.

Because of this fact we think that the District Judge was justified in denying the motion of the United States to intervene. If it were allowed it would serve only to becloud the true situation and give some semblance to the claim that United States has a real interest in the controversy on its own behalf and,

therefore, the court should retain jurisdiction. This we think should not be permitted. We do not base our conclusion on what is asserted to be the general rule that a third party may not intervene in an in personam action in admiralty. It is true that Rule 34 of the Admiralty Rules with regard to the right of a third party to intervene is limited to admiralty proceedings in rem and Rule 32 relates to the intervention of persons who have an interest in proceedings in the registry of the courts; and it has been decided in a number of cases that new claimants may not intervene in in personam actions in admiralty to assert new claims. See Ex parte Indiana Transportation Company, 244 U.S. 456, 37 S.Ct. 717, 61 L.Ed. 1253; Defense Plant Corporation v. United States Barge Lines, 2 Cir., 145 F.2d 766; Sheldrake v. The Chatfield, Eastern District of Virginia, 4 Cir., 52 F. 495; Bennett Day Importing Co., Inc., v. Compagnie Francaise de Navigation a Vapeur, 2 Cir., 42 F.2d 295.

In the pending case, however, there is no attempt on the part of the United States to set up a new claim. Whether the suit be regarded as an action on the part of the cargo owner to recover damages for itself from the owners of the ship, as it first seemed to be, or as an action by an insured to recover the loss for the benefit of the insurance company, as now appears to be the fact, the claim asserted by the original libellant and the claim asserted by the United States is one and the same. The petition for intervention prays that the court direct the amendment of the libel so as to join both the United States and ICOMI as libellants so that further proceedings be undertaken in their joint names. We think that such an amendment might properly be made under Rule 23 which permits amendments in matters of form and in matters of substance if the amended libel would serve to bring in the real party of interest in the subject matter of the suit. Such action has been permitted in cases involving the substitution of parties, where by amendment the real party in interest became the

libellant. See Levinson v. Deupree, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319; Keystone Telephone Co. v. United States, D. C., 49 F.Supp. 508. In view of these decisions we should have no difficulty, so far as procedural formalities are concerned, in permitting the intervention of the United States as party libellant in this case in addition to or in substitution for ICOMI. The difficulty which confronts the moving parties in the pending case is that even if intervention were allowed the case would still remain in essence a suit between foreign corporations and the court would be justified in denying jurisdiction under the doctrine of forum non conveniens.

ICOMI also contends somewhat feebly that the case should be allowed to proceed as a joint libel by the United States and itself because the precise sum due by the United States for the purchase of the cargo has not yet been definitely ascertained but will be found if the case goes to trial.

The purchase price of the manganese ore under the contract between ICOMI and the United States was affected by the moisture content of the material when delivered in the United States. Since this could not be ascertained before the arrival of the cargoes settlement was made in advance by the deduction of the average moisture content of 4.694% with adjustment later when the actual moisture content, which affected the weight of the material, was ascertained upon discharge of the cargo. This average figure was used in calculating the amount due by the insurance company for the loss of the cargo. It is now said that if the exact figure is ascertained in the trial of the instant case and it is shown that the moisture content was less than the average, ICOMI will be entitled to an additional payment from the United States and that both parties should be kept in the case until this determination is made. We are not told how the precise figure can be proved as to a cargo at the bottom of the sea, but assuming that it is possible, no good rea-

son is shown for the continuance of the present suit. There is at this time no controversy between the United States and ICOMI on the point and, even if there were, the possible solution of this incidental matter would not justify the court in retaining jurisdiction of the major controversy between the foreign corporations now before the court.

Affirmed.